1   Jonathan Evans (Cal. Bar #247376)
    CENTER FOR BIOLOGICAL DIVERSITY
2   1212 Broadway, Suite 800
    Oakland, CA 94612
3   Phone: 510-844-7100 x318
    Fax: 510-844-7150
4   email: jevans@biologicaldiversity.org

5   Counsel for Plaintiffs Center for Biological Diversity and
    Center for Environmental Health

6

7                    UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA
8

9   _____
                                        )
                                        )
10  CENTER FOR BIOLOGICAL DIVERSITY and, )
    CENTER FOR ENVIRONMENTAL HEALTH,     )
11                                       )   Case No.
                                         )
12                                       )   **COMPLAINT FOR DECLARATORY**
                                         )   **AND INJUNCTIVE RELIEF**
13        Plaintiffs,                    )
                                         )   (Clean Air Act, 42 U.S.C. §§ 7401 *et. seq.*)
14   v.                                  )
                                         )
15  MICHAEL S. REGAN,                    )
    in his official capacity as Administrator of the )
16  United States Environmental Protection Agency, )
                                         )
17        Defendant.                     )
    _____ )
18

19
                            **I.  INTRODUCTION**
20
21  1.       Plaintiffs CENTER FOR BIOLOGICAL DIVERSITY and CENTER FOR

22  ENVIRONMENTAL HEALTH (collectively "Environmental Groups") challenge the failure of

23  Defendant MICHAEL S. REGAN, in his official capacity as Administrator of the United States

28  Complaint

1   Environmental Protection Agency, (EPA) to perform mandatory duties required by the Clean Air

2   Act, 42 U.S.C. §§ 7401-7671q.  Specifically, the Clean Air Act establishes mandatory deadlines

3   for EPA to complete a thorough review of the secondary National Ambient Air Quality

4   Standards (NAAQS) for Nitrogen Oxides ($NO_x$), Sulfur Oxides ($SO_x$), and Particulate Matter

5   (PM), to make such revisions to these NAAQS as may be appropriate, to promulgate such new

6   NAAQS as may be appropriate, and to publish notice of such actions in the Federal Register

7   every five years.  EPA has failed to meet these deadlines.  The Environmental Groups thus bring

8   this action to ensure that they and their members and others who breathe harmful air pollution in

9   communities around the nation and appreciate ecosystems damaged by harmful air pollution will

10  enjoy the up-to-date scientific analysis and air quality standards that Congress intended them to

11  have.  Accordingly, Plaintiffs THE CENTER FOR BIOLOGICAL DIVERSITY and THE

12  CENTER FOR ENVIRONMENTAL HEALTH bring this action against Defendant MICHAEL

13  S. REGAN, in his official capacity as EPA Administrator, to compel EPA to perform these

14  mandatory duties.

15

16                                **II.  JURISDICTION**

17  2.      This case is a Clean Air Act citizen suit.  Therefore, the Court has jurisdiction over this

18  action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 42 U.S.C. § 7604(a)

19  (jurisdiction for citizen suits for failure to perform a non-discretionary duty required by the

20  Clean Air Act).

21  3.      An actual controversy exists between the parties.  This case does not concern federal

22  taxes, is not a proceeding under 11 U.S.C. §§ 505 or 1146, and does not involve the Tariff Act of

23  1930.  Thus, this Court has authority to order the declaratory relief requested under 28 U.S.C. §

28

1    2201.  If the Court orders declaratory relief, 28 U.S.C. § 2202 authorizes this Court to issue

2    injunctive relief.

3

4                                    **III.  NOTICE**

5    4.        On February 2, 2022, the Environmental Groups mailed to EPA by certified mail, return

6    receipt requested, written notice of intent to sue regarding the violations alleged in this

7    Complaint.  EPA received this notice of intent to sue letter no later than February 8, 2022.  More

8    than sixty days have passed since EPA received this "notice of intent to sue" letter.  EPA has not

9    remedied the violations alleged in this Complaint.  Therefore, a present and actual controversy

10   exists.

11

12                                   **IV.  VENUE**

13   5.        Defendant EPA resides in this judicial district.  EPA Region 9 is headquartered in San

14   Francisco.  This civil action is brought against an officer of the United States acting in his

15   official capacity.  In addition, Plaintiff Center for Environmental Health headquartered in

16   Oakland, California and thus resides in this judicial district.  Therefore, venue is proper in this

17   Court pursuant to 28 U.S.C. § 1391(e).

18

19                         **V.  INTRADISTRICT ASSIGNMENT**

20   6.        EPA Region 9 is headquartered in San Francisco.  Accordingly, assignment to the San

21   Francisco Division or the Oakland Division is proper pursuant to Civil L.R. 3-2(c) and (d).

22                                   **VI.  PARTIES**

23

                                   COMPLAINT – 3

28

7.     Plaintiff the CENTER FOR BIOLOGICAL DIVERSITY is a non-profit 501(c)(3) corporation incorporated in California.  The Center for Biological Diversity has over 89,000 members throughout the United States and the world.  The Center for Biological Diversity's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands and waters, and public health through science, policy, and environmental law.  Based on the understanding that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked, the Center for Biological Diversity is working to secure a future for animals and plants hovering on the brink of extinction, for the ecosystems they need to survive, and for a healthy, livable future for all of us.

8.     The Center for Biological Diversity and its members include individuals with varying interests in public health, wildlife species and their habitat ranging from scientific, professional, and educational to recreational, aesthetic, moral, and spiritual.  Further, the Center for Biological Diversity's members enjoy, on an ongoing basis, the biological, scientific, research, educational, conservation, recreational, and aesthetic values of the regions inhabited by these species, including the regions at issue in this action.  The Center for Biological Diversity's members observe and study native species and their habitat, and derive professional, scientific, educational, recreational, aesthetic, inspirational, and other benefits from these activities and have an interest in preserving the possibility of such activities in the future.  The Center for Biological Diversity and its members have participated in efforts to protect and preserve public health and natural areas, including the habitat essential to the continued survival of native species, and to address threats to the continued existence of these species, including the threats posed by air pollution and other contaminants.

9.      Plaintiff the CENTER FOR ENVIRONMENTAL HEALTH is an Oakland, California based nonprofit organization that helps protect the public from toxic chemicals and promotes business products and practices that are safe for public health and the environment. The Center for Environmental Health works in pursuit of a world in which all people live, work, learn, and play in healthy environments.

10.      Plaintiffs' members live, work, recreate, travel and engage in other activities throughout the areas at issue in this complaint and will continue to do so on a regular basis.  Pollution in the affected areas threatens and damages, and will continue to threaten and damage, the health and welfare of Plaintiffs' members as well as their ability to engage in and enjoy their other activities.  Pollution diminishes Plaintiff's members' ability to enjoy the aesthetic qualities and recreational opportunities of the affected area.  For example, Plaintiffs' have a member who frequently observes the whooping crane.  NOx and SOx emissions harm the aquatic ecosystems the whooping crane needs to survive.  Plaintiffs also have members who enjoy observing flora that can be adversely affected by NOx deposition that alters the ability of native species to compete with non-native competitors or which can be adversely affected by SOx or PM pollution.

11.      EPA's failure to timely perform the mandatory duties described herein also adversely affects Plaintiffs, as well as their members, by depriving them of procedural protection and opportunities, as well as information that they are entitled to under the Clean Air Act.  The failure of EPA to perform the mandatory duties also creates uncertainty for Plaintiffs' members as to whether they are exposed to excess air pollution.

12.      The above injuries will continue until the Court grants the relief requested herein.

13.     Defendant MICHAEL S. REGAN is the Administrator of the EPA.  In that role Administrator Regan has been charged by Congress with the duty to administer the Clean Air Act, including the mandatory duties at issue in this case.  Administrator Regan is also charged with overseeing all EPA regional offices including EPA Region 9, which is headquartered in San Francisco.

## VII.  LEGAL BACKGROUND

14.     Congress enacted the Clean Air Act to "speed up, expand, and intensify the war against air pollution in the United States with a view to assuring that the air we breathe throughout the Nation is wholesome once again."  H.R. Rep. No. 1146, 91st Cong., 2d Sess. 1,1, 1970 U.S. Code Cong. & Admin. News 5356, 5356.  To promote this, the Act requires EPA to set National Ambient Air Quality Standards for certain pollutants.  42 U.S.C. § 7409(a).  National Ambient Air Quality Standards establish maximum allowable concentrations in the air of such pollutants.

15.     Specifically, Section 108 of the CAA requires EPA to identify pollutants that "may reasonably be anticipated to endanger public health and welfare" and to issue air quality criteria for those pollutants.  42 U.S.C. § 7408.  Section 109 of the Clean Air Act (42 U.S.C. § 7409) requires EPA to promulgate secondary NAAQS for pollutants that "may reasonably be anticipated to endanger … welfare". 42 U.S.C. § 7408. "[E]ffects on welfare include[], but [are] not limited to effects on soils, water, crops, vegetation, manmade materials, animals, wildlife, weather, visibility, and climate, damage to and deterioration of property, and hazards to transportation, as well as effects on economic values and on personal comfort and well-being, whether caused by transformation, conversion, or combination with other air pollutants." 42 U.S.C. § 7602(h).

16.     Section 109(d)(1) further requires that "at five year intervals" EPA "shall complete a thorough review of the criteria published under [section 108] and the national ambient air quality standards promulgated under this section and shall make such revisions in such criteria and standards and promulgate such new standards as may be appropriate."  42 U.S.C. § 7409(d)(1). Each time it goes through this review process, EPA must publish in the Federal Register its revision decision concerning the air quality criteria and NAAQS for the pollutant at issue (including any new or revised NAAQS resulting from that review), as well as notice of the issuance of any revised air quality criteria for that pollutant.  See 42 U.S.C. §§ 7408(d), 7607(d).

17.     Courts have held that the duties prescribed by § 109(d)(1) are nondiscretionary.  For example, the Second Circuit rejected an argument that § 109(d)(1) merely imposed a duty to avoid unreasonable delay, finding that the provision instead established a nondiscretionary duty: "when, as here, a statute sets forth a bright-line rule for agency action, . . . there is no room for debate -- Congress has prescribed a categorical mandate that deprives EPA of all discretion over the timing of its work."  *American Lung Association v. Reilly*, 962 F.2d 258, 263 (2d Cir. 1992) (emphasis added).  The D.C. Circuit subsequently "agree[d]" with this Second Circuit ruling. *American Trucking Assns. v. United States EPA*, 175 F.3d 1027, 1047 (D.C. Cir. 1999), *rehearing granted in part on other grounds*, *denied in part*, 195 F.3d 4 (D.C. Cir. 1999), *rev'd in part on other grounds, aff'd in part sub nom. Whitman v. American Trucking Assns.*, 531 U.S. 457 (2001).

18.     Moreover, EPA's own interpretation of § 109(d)(1) acknowledges the nondiscretionary nature of the deadline.  For example, with respect to the NAAQS for $NO_2$, EPA long ago recognized that section 109(d)(1) "requires EPA to review the scientific basis of existing National Ambient Air Quality Standards (NAAQS) every 5 years."  45 Fed. Reg. 77,768 (Nov.

COMPLAINT – 7

24, 1980).  EPA reaffirmed this straightforward reading with respect to the NAAQS for ozone:

"Under section 109(d)(1) of the Act, EPA is required to perform a review of the ozone NAAQS

every five years."  61 Fed. Reg. 19,195 (May 1, 1996).  Thus, EPA has interpreted 42 U.S.C. §

7409(d)(1) to impose a mandatory duty.

## VIII.   FACTS

**A.    NITROGEN OXIDES**

19.     Nitrogen oxides ($NO_x$) such as nitrogen dioxide ($NO_2$) are highly reactive gases emitted

primarily through the combustion of fossil fuels in mobile and stationary sources.

20.     $NO_x$ emissions contribute to a variety of public health problems.  $NO_x$ emissions are a

precursor of ground-level ozone and particulate matter pollution.  $NO_x$ emissions also play a role

in the accumulation of excess nitrates in drinking water, the eutrophication of aquatic ecosystems

and nitrification of soils, global climate change, increases in toxic pollutant levels, and the

depletion of the ozone layer.  70 Fed. Reg. 8888-89 (Feb. 23, 2005).

21.     EPA claims that $NO_2$ accounts for the vast majority of $NO_x$ in the atmosphere, and has

used this claim as a justification to use $NO_2$ as a surrogate for $NO_x$ since first promulgating the

NAAQS for $NO_2$ in 1971.  See 36 Fed. Reg. 8,186.

22.     EPA last reviewed the secondary $NO_x$ NAAQS no later than June 4, 2012. 77 Fed. Reg.

20,218 (Apr. 3, 2012).

23.     EPA last reviewed the air quality criteria document, which EPA now calls an integrated

science assessment (ISA), for $NO_x$ no later than October 19, 2020. 85 Fed. Reg. 66,327 (Oct. 19,

2020); Integrated Science Assessment for Oxides of Nitrogen, Oxides of Sulfur, and Particulate Matter – Ecological Criteria, October 2020 (2020 ISA).

23.     The 2020 ISA demonstrates that the welfare impacts from $NO_x$ are worse than was known when EPA reviewed the NAAQS in 2012.

24.     For example, for the 2012 secondary NAAQS review, the science was sufficient to infer a likely causal relationship between acidifying nitrogen deposition and the alteration of soil biogeochemistry in terrestrial ecosystems. Integrated Science Assessment for Oxides of Nitrogen and Sulfur – Ecological Criteria, December 2008 (2008 ISA) at 3-109. However, the 2020 ISA solidifies this finding such that EPA can definitively say there is a causal relationship between nitrogen deposition and the alteration of soil biogeochemistry in terrestrial ecosystems. 2020 ISA at 4-1. New studies confirm that nitrogen depositions become rapidly incorporated into ecosystems as litter and recalcitrant organic matter in the soil. 2020 ISA at 4-7.

25.     Moreover, for the 2012 secondary NAAQS review, the science was inadequate to infer a relationship between nitrogen deposition and the productivity of terrestrial ecosystems.  In the 2020 ISA, however, the science now suggests that there is a causal relationship between nitrogen depositions and increased productivity in terrestrial ecosystems, which can alter the composition and decrease diversity in terrestrial ecosystems. 2020 ISA at IS-46. These suggestions of a causal relationship are very important.  NAAQS setting is not like a tort case where EPA must prove causation by a preponderance of the evidence.  Rather, Congress' directive that EPA provide an adequate margin of safety is meant to address uncertainties associated with inconclusive scientific and technical information. 2020 ISA at xlix.  This new science, however, provides no protection to the American public until EPA uses the science to revise the NAAQS.

26.     More than five years has passed since EPA completed its last review and determination of the need for revision of the secondary $NO_x$ NAAQS. According to the clear statutory deadlines, such a review should have been completed by no later than June 4, 2017. Thus, EPA's ongoing failure to complete this review and to make the necessary revisions to the NAAQS is contrary to Section 109(d)(1) of the Clean Air Act. *See* 42 U.S.C. § 7409(d)(1).

**B.     SULFUR DIOXIDE**

27.     Sulfur Oxides ($SO_x$) such as sulfur dioxide ($SO_2$) are a group of gases formed primarily from the combustion of fossil fuel containing sulfur, such as coal.  $SO_x$ are also released during the manufacture of metals and in some oil refining processes.

28.     $SO_x$ emissions have a variety of negative effects on human health.  $SO_x$ pollution contributes to respiratory problems, particularly for children and the elderly, and aggravates existing heart and lung diseases.  $SO_x$ emitted over a short period can be harmful to asthmatics. $SO_x$ also contribute to the formation of acid rain, which damages trees, crops, historic buildings, and monuments and alters the acidity of both soils and water bodies.  In addition, because $SO_x$ emissions may be transmitted long distances, they contribute to visibility impairment problems in many national parks.  See EPA, Office of Air Quality Planning and Standards, "$SO_2$ – How Sulfur Dioxide Affects the Way We Live & Breathe" (Nov. 2000), available at http://www.epa.gov/air/urbanair/so2/index.html.

29.     $SO_2$ is the sulfur oxide that EPA has used as the indicator for regulation of all $SO_x$ emissions since first promulgating NAAQS for $SO_2$ in 1971.  *See* 36 Fed. Reg. 8186.

30.     The current secondary NAAQS for $SO_2$ is 0.5 part-per-million, as a 3-hour average, not to be exceeded more than once per year. 77 Fed. Reg. 20,281 (Apr. 3, 2012).

31.     Despite the clear statutory language requiring EPA to review and update the NAAQS for all regulated pollutants every five years, it has been nearly ten years since EPA last completed such a review to update the secondary NAAQS for $SO_x$.  During this time, no review of the secondary NAAQS for $SO_x$ has been completed.

32.     EPA last reviewed the secondary NAAQS for $SO_x$ no later than June 4, 2012. 77 Fed. Reg. 20,218 (Apr. 3, 2012).  EPA last reviewed the air quality criteria document, which EPA now calls an integrated science assessment (ISA), for $SO_x$ no later than October 19, 2020. 85 Fed. Reg. 66,327 (Oct. 19, 2020). More than five years has passed since EPA completed its last review of the secondary NAAQS for $SO_x$.  According to the clear statutory deadlines, such a review should have been completed by no later than June 4, 2017.

33.     According to EPA's 2020 ISA, the science behind the adverse ecological impacts of $SO_x$ has become more certain since EPA's last review.  In the 2012 review of the secondary NAAQS for $SO_x$, the science was inadequate to infer a causal relationship between sulfur deposition and changes in biota due to sulfide phototoxicity. In the 2020 ISA, the science now suggests that there is a causal relationship between sulfur deposition and changes in biota, which can alter growth, productivity, species physiology and richness, and biodiversity in wetland and freshwater ecosystems. 2020 ISA at IS-95.

C.     **PARTICULATE MATTER**

34.     Particulate matter (PM) is a mixture of inhalable solid and liquid particles in the air, and there are separate standards for different particle types. PM is separated into $PM_{10}$, particles with diameters 10 micrometers or smaller, and $PM_{2.5}$, particles with diameters 2.5 micrometers and smaller, which are the type that pose the greatest risk to health. "Particulate Matter (PM)

Pollution –Particulate Matter Basics" <u>available at</u> https://www.epa.gov/pm-pollution/particulate-matter-pm-basics.

35.   Sources of $PM_{2.5}$ emissions include industrial activities, motor vehicles, and fuel combustion. Particulate matter impairs visibility, harms sensitive ecosystems, and effects climate.

36.   The current secondary NAAQs for PM are a 3-year annual mean of 15 µg/m$^3$, with the 24-hour average $PM_{2.5}$ and $PM_{10}$ set at concentrations of 35 µg/m$^3$ and 150 µg/m$^3$. 78 Fed. Reg. 3085, 3182 (Jan. 15, 2013).

37.   More than five years have passed since EPA last reviewed and revised the secondary NAAQS for PM.  According to the clear statutory deadlines, such a review should have been completed by no later than March 18, 2018.

38.   In 2019, EPA published an integrated science assessment regarding the health and welfare impacts of PM. Integrated Science Assessment for Particulate Matter, December 2019 (2019 ISA).  The 2019 ISA supports and strengthens previous findings regarding the causal relationship between PM and climate impacts, specifically how PM affects cloud processes. 2019 ISA at 13-2.

39.   The 2020 ISA reaffirms the ecological findings EPA made in its last review.  In a previous ISA, the science suggested that PM deposition was likely to alter photosynthesis, transpiration, and growth. Integrated Science Assessment for Particulate Matter, December 2009 (2009 ISA).  The 2020 ISA supports these findings. 2020 ISA at IS-99.

///

///

///

# IX.  CLAIM FOR RELIEF

## CLAIM ONE

### (CAA Sections 304(a)(2) and 109(d)(1) for NOx)

40.     Each allegation set forth in the complaint is incorporated herein by reference.

41.     The deadline under Clean Air Act § 109(d)(1) for Defendant to complete another cycle of review, revision, and promulgation actions with respect to $NO_x$ expired more than five years ago. Nonetheless, Defendant has failed to perform those actions.

42.     Specifically, EPA last reviewed the secondary $NO_x$ NAAQS no later than June 4, 2012. 77 Fed. Reg. 20,218 (April 3, 2012).

43.     Thus, EPA has a mandatory duty to complete a thorough review and revise the existing NAAQS and promulgate new NAAQS as appropriate and publish notice of such actions by no later than June 4, 2017.  42 U.S.C. §§ 7409(d), 7607(d).

44.     Defendant has failed to do so.

45.     Defendant's failure to perform each of the above actions constitutes a failure to perform an act or duty (or acts or duties) that are not discretionary with Defendant within the meaning of Clean Air Act § 304(a)(2).  42 U.S.C. § 7604(a)(2).

///

///

///

CLAIM TWO

**(CAA Sections 304(a)(2) and 109(d)(1) for SOx)**

46.     Each allegation set forth in the complaint is incorporated herein by reference.

47.     The deadline under Clean Air Act § 109(d)(1) for Defendant to complete another cycle of review, revision, and promulgation actions with respect to $SO_x$ expired more than five years ago. Nonetheless, Defendant has failed to perform those actions.

48.     Specifically, EPA last reviewed the secondary $SO_x$ NAAQS no later than June 4, 2012. 77 Fed. Reg. 20218 (April 3, 2012).

49.     Thus, EPA has a mandatory duty to complete a thorough review of the NAAQS and promulgate new NAAQS for $SO_x$ as appropriate and publish notice of such actions by no later than June 4, 2017.  42 U.S.C. §§ 7409(d), 7607(d).

50.     Defendant has failed to do so.

51.     Defendant's failure to perform each of the above actions constitutes a failure to perform an act or duty (or acts or duties) that are not discretionary with Defendant within the meaning of Clean Air Act § 304(a)(2).  42 U.S.C. § 7604(a)(2).

///

///

///

1

<u>CLAIM THREE</u>

2

**(CAA Sections 304(a)(2) and 109(d)(1) for PM)**

3

4   52.      Each allegation set forth in the complaint is incorporated herein by reference.

5   53.      The deadline under § 109(d)(1) for Defendant to complete another cycle of review,

6   revision, and promulgation actions with respect to PM expired more than five years ago.

7   Nonetheless, Defendant has failed to perform those actions.

8   54.      Specifically, EPA last completely reviewed the secondary PM NAAQS no later than

9   March 18, 2013. 78 Fed. Reg. 3085 (Jan. 15, 2013).[1]

10  55.      Thus, EPA has a mandatory duty to complete a thorough review of the NAAQS and

11  revise the NAAQS and promulgate new NAAQS for PM as appropriate and publish notice of

12  such actions by no later than March 18, 2018.  42 U.S.C. §§ 7409(d), 7607(d).

13  56.      Defendant has failed to do so.

14  57.      Defendant's failure to perform each of the above actions constitutes a failure to perform

15  an act or duty (or acts or duties) that are not discretionary with Defendant within the meaning of

16  Clean Air Act § 304(a)(2).  42 U.S.C. § 7604(a)(2).

17  ///

18  ///

19  ///

20

21

22

23  _____

[1] EPA did conclude a partial review of the secondary PM NAAQS on December 18, 2020.  *See* 85 Fed. Reg. 82,684 (Dec. 18, 2020).

28

1

## REQUEST FOR RELIEF

2          WHEREFORE, Plaintiffs respectfully request that the Court:

3     A.    Declare that the Administrator is in violation of the Clean Air Act with regard to his

4           failure to perform the mandatory duties listed above;

5     B.    Issue a mandatory injunction requiring the Administrator to perform his mandatory duties

6           listed above by certain dates;

7     C.    Retain jurisdiction of this matter for purposes of enforcing the Court's order;

8     D.    Grant Plaintiffs their reasonable costs of litigation, including attorneys' and experts' fees;

9           and;

10    E.    Grant such further relief as the Court deems just and proper.

11

12                                      Respectfully submitted,

13                                      */s/Jonathan Evans*
                                        Jonathan Evans (Cal. Bar #247376)
                                        CENTER FOR BIOLOGICAL DIVERSITY
14                                      1212 Broadway
                                        Suite 800
15                                      Oakland, CA 94612
                                        Phone: 510-844-7100 x318
16                                      Fax: 510-844-7150
                                        email: jevans@biologicaldiversity.org
17
                                        Counsel for Plaintiffs
18
      Dated: April 13, 2022
19

20

21

22

23

28